```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

RAYMOND ALZAMORA, MICHAEL DUNN and       :        ECF CASE
CREATIVE HOMES INC.,
                                         :     06 Civ. 7644 (WCC)
                    Plaintiffs,
                                         :
          - against -                             OPINION
                                         :        AND ORDER
THE VILLAGE OF CHESTER and THE PLANNING
BOARD OF THE VILLAGE OF CHESTER,         :

                    Defendants.          :

- - - - - - - - - - - - - - - - - - - - X
```

**A P P E A R A N C E S :**

JAMES G. SWEENEY, P.C.
**Attorneys for Plaintiffs**
One Harriman Square
P.O. Box 806
Goshen, New York 10924

JAMES G. SWEENEY, ESQ.

      Of Counsel

BOEGGEMAN, GEORGE, HODGES
  & CORDE, P.C.
**Attorneys for Defendants**
11 Martine Avenue
White Plains, New York 10606

CYNTHIA DOLAN, ESQ.

      Of Counsel

**Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiffs Raymond Alzamora, Michael Dunn and Creative Homes Inc.[1] bring this action, pursuant to 42 U.S.C. § 1983, against the Village of Chester (the "Village")[2] and the Planning Board of the Village of Chester (the "Board") alleging a violation of their procedural due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. Specifically, plaintiffs claim that they received a special use permit to construct a multiple dwelling residential building in the Village intended to be occupied by individuals over the age of fifty-five, and the Board thereafter enacted amendments to the Village Zoning Law that prohibited plaintiffs' planned construction under the permit. They allege that the Board had knowledge that the amendments to the zoning law would prohibit plaintiffs' construction project – the only pending project in the Village that would have been affected by the change in law – yet it failed to provide them actual notice of the Village meeting at which the proposed amendments were discussed. Plaintiffs were therefore unable to publicly oppose the enactment of the proposed amendments, and they claim that defendants' failure to notify them of the meeting was a violation of their procedural due process rights guaranteed by the Fourteenth Amendment. Defendants now move pursuant to FED. R. CIV. P. 12(b)(6) to dismiss the action in its entirety.[3] For the following reasons, defendants' motion is granted.

---

[1] Creative Homes is a New York corporation solely owned and controlled by Alzamora. (*See* Complt. ¶ 5.)

[2] The Village is located in Orange County, New York. (*See* Complt. ¶ 9.)

[3] Defendants request that we treat this motion as one for summary judgment. Although we granted defendants permission to file a motion for summary judgment pursuant to FED. R. CIV. P. 56 at the November 3, 2006 pre-motion conference, it is unnecessary to consider any material outside plaintiffs' Complaint to resolve the legal question at issue, and we will thus treat the motion as made pursuant to FED. R. CIV. P. 12(b)(6).

## BACKGROUND

The following facts are taken from plaintiffs' Complaint.  Alzamora owns a 2.4 acre tract of land in the Village having access to Main Street, and Dunn owns a 150 by 50 foot parcel of land adjoining Alzamora's property having frontage on Elm Street.  (*See* Complt. ¶¶ 2, 4, 7.)  On September 9, 1998, Alzamora and Dunn, through Creative Homes, applied for a special use permit and site plan approval from the Village to construct a thirty-two unit multiple dwelling residential development on Alzamora's property intended for occupancy by individuals over the age of fifty-five (the "Project").[4]  (*See* Complt. ¶¶ 2, 7, 15.)  The proposed project site was located in a "B-1 zoning district" of the Village which, at the time of plaintiffs' application, allowed for the construction and operation of the Project.  (*See* Complt. ¶ 14.)

Pursuant to the Village Zoning Law, plaintiffs submitted their application to the Board, which, when considering applications, "take[s] into consideration the public health, safety and general welfare" of the public and, in particular, the residents residing near the proposed land use. *See* Village Zoning Law §§ 98-25(A)*,* 98-24.  In deciding applications for special use permits and site plan approvals, the Board may hold public hearings to receive comments from the community, after which it has sixty-two days to render a final decision, and must at all times comply with the

---

[4]  Under the Village Zoning Law, a special use permit is "[a]n authorization of a particular land use which is permitted under the Zoning Law, subject to conditions imposed by such Zoning Law to assure that the proposed use is in harmony with such Zoning Law and will not adversely affect the neighborhood if such conditions are met."  Village Zoning Law § 98-3.  A site plan is "[a] plan for the proposed development of a property, showing location of buildings, means of ingress and egress to the property, circulation within the property, treatment of all open areas and the general relationship of said property to abutting properties."  *See id.* § 98-3.  An acceptable site plan is a prerequisite to the issuance of a permit.  *See id.*

2

provisions of the New York State Environmental Quality Review Act ("SEQRA").[5]  *See id.* §§ 98-28(A), (C), 98-25(B), 98-24(H).

With respect to plaintiffs' application, the Board required plaintiffs and their professionals to submit various supplemental documents,[6] attend several meetings,[7] prepare a 500-page draft Environmental Impact Statement ("EIS")[8] and propose a secondary means of access to the site of the Project.[9]  (*See id.* ¶¶ 15, 17, 22-26.)  On August 22, 2000, the Board held a public hearing regarding the draft EIS and the revised site plan, and it directed plaintiffs to submit a supplemental draft EIS,

---

[5] "The basic purpose of SEQR is to incorporate the consideration of environmental factors into the existing planning, review and decisionmaking processes of state, regional and local government agencies at the earliest possible time. To accomplish this goal, SEQR requires that all agencies determine whether the actions they directly undertake, fund or approve may have a significant impact on the environment, and, if it is determined that the action may have a significant adverse impact, prepare or request an environmental impact statement."  N.Y. Comp. Codes R. & Regs., tit. 6, § 617.1(c) (2007).

[6] Among other documents, plaintiffs were required to submit a "short" and "full" Environmental Assessment Form ("EAF") as required by SEQRA.  (*See* Complt. ¶¶ 16, 20.)  An EAF is a form containing the proposed action, its location, its purpose and its potential impacts on the environment.  N.Y. Comp. Codes R. & Regs., tit. 6, § 617.2(m).  It is used by the Board to assist it in determining the environmental significance or nonsignificance of the proposed actions.  *See id.*

[7] Plaintiffs or their professionals were required to attend meetings on November 17, 1998, May 25, 1999 and August 22, 2000.  In addition, the Complaint alleges that, between November 1998 and December 2001, plaintiffs' professionals "appeared eighteen times before the Board at either 'workshop' or formal sessions of the Board and, additionally, at two public hearings . . . ."  (*See* Complt. ¶¶ 17, 30, 35.)

[8] An EIS is a document prepared to provide "a means for agencies, project sponsors and the public to systematically consider significant adverse environmental impacts, alternatives and mitigation."  N.Y. Comp. Codes R. & Regs., tit. 6, § 617.2(n).  "To require an EIS for a proposed action, the lead agency must determine that the action may include the potential for at least one significant adverse environmental impact."  *Id.* § 617.7(a)(1).

[9] In response, plaintiffs proposed to use Dunn's property as a secondary access parcel for the development.   (*See* Complt. ¶ 2.)

3

which they submitted in December 2001.  (*See id.* ¶¶ 27-29.)  On January 22, 2002, the Board determined that the application was ready for public comment and held the final meeting on February 26, 2002 at which plaintiffs' professionals reiterated the details of the Project.  (*See id.* ¶¶ 31-34.) After the February meeting, plaintiffs did not agree to, nor did the Board request, any extensions of time to consider the application.  (*See id.* ¶ 36.)  The Board continued, however, to request that plaintiffs revise and supplement their application, provide a "final" EIS and attend various meetings and workshops in connection with their application.  (*See id.* ¶¶ 38-40.)

        In 2004, during the pendency of plaintiffs' application, the Board made a recommendation to the Village Board of Trustees (the "Trustees") to amend the Village Zoning Law to reduce the allowable density for senior citizens projects by increasing the minimum lot size to three acres and limiting the number of units to a maximum of nine per acre.  (*See id.* ¶ 41.)  The Trustees scheduled a public hearing on November 8, 2004 to discuss the proposed amendments, which, if enacted, would have disallowed the construction of plaintiffs' Project, as it entailed thirty-two units on a 2.4 acre parcel of land.  (*See id.* ¶ 45.)  Although the Board had knowledge of plaintiffs' names and addresses, it did not inform plaintiffs of its recommendation to the Trustees, and public notice of the hearing was given only by means of a single publication in the local newspaper.  (*See id.* ¶¶ 44, 46-48.) Consequently, plaintiffs did not attend the meeting and were unable to oppose the enactment of the proposed amendments.  (*See id.* ¶ 49.)  At the hearing, the Village Mayor indicated that the proposed changes, if enacted, would impact plaintiffs' pending application.  (*See id.* ¶ 50.)  The Trustees ultimately adopted the Board's proposed amendments as "Local Law No. 5 of 2004."  (*See id.* ¶ 52.)

        Similarly, in 2005, the Board recommended to the Trustees that the Village Zoning Law be further amended to extend the requirements of Local Law No. 5 of 2004 to all multiple dwelling

projects and not just those for senior citizens.  (*See id.* ¶¶ 55, 57.)  The Trustees scheduled a public

hearing on August 8, 2005 to discuss the enactment of the proposed amendment.  (*See id.* ¶ 58.)  As

with Local Law No. 5 of 2004, public notice of the hearing was given only once by means of a single

publication appearing in the local newspaper.  (*See id.* ¶¶ 59-60.)  Plaintiffs were unaware of the

meeting and did not attend.  (*See id.* ¶ 61.)  At the close of the public hearing, the Trustees adopted

the Board's proposed amendment as "Local Law No. 2 of 2005."  (*See id.* ¶ 63.)

      Plaintiffs did not learn of the Local Law No. 5 of 2004 until July 6, 2006 when, at a workshop

regarding plaintiffs' application, the Board advised plaintiffs' professionals of its enactment and

asked whether the Project would comply with its reduced density requirements.  (*See id.* ¶¶ 54, 66-

67.)  On July 7, 2007, plaintiffs' professionals informed the Board's attorney by letter that the Project

did not conform with Local Law No. 5 and that plaintiffs would therefore propose to operate a regular

adult community to avoid the new requirements, which they believed applied only to senior citizen

projects.  (*See id.* ¶ 69.)  In addition, plaintiffs' professionals urged the Board to issue the special use

permit, particularly in light of the fact that, in their opinion, plaintiffs' application was deemed

granted by virtue of Village Zoning Law § 98-25(D), which provides:

> Failure of the Planning Board to take action on a special permitted use within sixty-
> two [] days of the public hearing shall be construed as approval of such use by the
> Planning Board; provided, however, that the time within which the Planning Board
> must render its decision may be extended by mutual consent of the applicant and the
> Planning Board.

(*See id.* ¶ 70.)  Although the public hearing was held on February 26, 2002, the Board had not yet

rendered a decision with respect to plaintiffs' application.  (*See id.* ¶¶ 37, 40.)

      On July 18, 2006, the Board's attorney sent plaintiffs' professionals a letter notifying them

of the enactment of Local Law No. 2 of 2005, which would prohibit plaintiffs' Project even if it were

operated as an adult community, and opined that the default provision of Village Zoning Law § 98-25(D) was not applicable.  (*See id.* ¶¶ 65, 71.)  Thereafter, plaintiffs' professionals attended a regular meeting of the Board on July 25, 2006 and advised the Board that the Project could not meet the requirements of either Local Law No. 5 of 2004 or Local Law No. 2 of 2005.  (*See id.* ¶ 74.) Plaintiffs' professionals again requested the Board to nevertheless grant plaintiffs' application, and the Board refused.  (*See id.* ¶¶ 75-76.)  Finally, plaintiffs' professionals presented a written demand upon the Secretary of the Board demanding that she advise the Village Building Inspector that the special use permit for the Project was deemed approved by reason of the Board's failure to approve or disapprove the application within sixty-two days of the February 26, 2002 hearing.  (*See id.* ¶ 77.) The Secretary's attorney, by letter dated August 2, 2006, declined to do so, and this lawsuit ensued. (*See id.* ¶ 78.)

## DISCUSSION

### I.    Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all of the well-pleaded facts as true and consider those facts in the light most favorable to the non-moving party.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir. 1993); *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 583 (S.D.N.Y. 1993) (Conner, J.). On such a motion, the issue is "whether the claimant is entitled to offer evidence to support the claims."  *Scheuer*, 416 U.S. at 236.  A complaint should not be dismissed for failure to state a claim "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Padavan v. United States*, 82 F.3d 23, 26 (2d Cir. 1996) (quoting

*Hughes v. Rowe*, 449 U.S. 5, 10 (1980)).  However, allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, are insufficient as a matter of law.  *See Martin v. N.Y. State Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir. 1978).

## II.    <u>Plaintiffs' Procedural Due Process Claim</u>

Plaintiffs allege that the Village and Board denied them their procedural due process rights under the Fourteenth Amendment by failing to notify them of the public meetings regarding the proposed enactments of Local Law No. 5 of 2004 and Local Law No. 2 of 2005.  To prevail on a procedural due process claim, plaintiffs must first demonstrate that they were deprived of a federally-protected property interest.  *See  Johnson v. N.Y. City Police Dep't*, 25 Fed. App'x 32, 33 (2d Cir. 2001); *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999); *Overhoff v. Ginsburg Dev., L.L.C.*, 143 F. Supp. 2d 379, 386 (S.D.N.Y. 2001);  *Sudarsky v. City of New York*, 779 F. Supp. 287, 294 (S.D.N.Y. 1991).  "Since property interests are not created by the Constitution, federal courts must look instead to 'existing rules or understandings that stem from . . . state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits' in deciding whether such a property interest existed."  *Sudarsky*, 779 F. Supp. at 294 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 576-77 (1972)).

In the present case, plaintiffs' claimed protected property interest is the use of the special use permit despite the enactment of more restrictive zoning laws prohibiting the construction and

7

operation of the Project.[10]  "In order for an interest in a particular land-use benefit to qualify as a property interest for purposes of the . . . due process clause[,] a landowner must show a 'clear entitlement' to that benefit."  *O'Mara v. Town of Wappinger*, 485 F.3d 693, 700 (2d Cir. 2007) (internal citation omitted).  However, "as a matter of law, plaintiff[s] had no assurance that the zoning regulations would remain unchanged."  *Sag Harbor Port Assocs. v. Vill. of Sag Harbor*, 21 F. Supp. 2d 179, 183 (E.D.N.Y. 1998), *aff'd*, 182 F.3d 901 (2nd Cir. 1999).

> "Nothing in the town's zoning laws or in any New York State law suggests that such an assurance has been made either explicitly or implicitly.  If there is one thing that the history of zoning regulation has established it is that as time passes and population increases (or diminishes) zoning restrictions change."

*Id.* (quoting *Elias v. Town of Brookhaven*, 783 F. Supp. 758, 761 (E.D.N.Y. 1992)); *see also DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 130 (2d Cir. 1998) ("New York zoning law appears to take into account the somewhat intuitive concept that 'a property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers.'") (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992)).

It is axiomatic that, "[u]nder New York law, a property owner has no right to the existing zoning status of his land unless his right has become 'vested.'"  *DLC Mgmt. Corp.*, 163 F.3d at 130. As the Second Circuit explained in a similar case:

In order for a right in a particular zoning status to vest, a property owner must have

---

[10] Plaintiffs emphatically allege that they received a special use permit to construct and operate the Project.  They do not allege, for example, that their constitutional rights were violated by the denial of the actual permit.  Rather, plaintiffs contend that their procedural due process rights were violated by not receiving actual notification of the public meeting regarding the proposed amendments to the zoning law which, if enacted, would effectively render their previously-issued permit useless.

undertaken substantial construction and must have made substantial expenditures prior
to the enactment of the more restrictive zoning ordinance. . . . Where . . . there has
been no construction or other change to the land itself, a property owner has no right
to complete a project permitted under an earlier zoning classification.

*Id.* (internal quotation marks omitted; internal citations omitted); *see also Sag Harbor Port Assocs.*,

21 F. Supp. 2d at 183 ("Had plaintiff received the permit and begun construction before the enactment

of Local Law No. 2, it may have been able to establish a vested right to complete the project because,

under New York law, whenever a more restrictive zoning ordinance is enacted, a property owner is

permitted to complete a nonconforming project if substantial expenditures were made prior to the

effective date of the new law."); *Sudarsky*, 779 F. Supp. at 295 ("If plaintiffs had obtained a building

permit and succeeded in completing a substantial portion of the construction of their development,

their right to complete the project would have vested at the time the down-zoning was effected. Under

New York law, an owner is permitted to complete a development which has been rendered

nonconforming by the passage of a more restrictive zoning ordinance if the owner has 'undertaken

substantial construction and made substantial expenditures prior to the effective date of the [new

ordinance].'") (quoting *Ellington Constr. Corp. v. Zoning Bd. of Appeals of Inc. Vill. of New

Hempstead*, 77 N.Y.2d 114, 564 N.Y.S.2d 1001, 1005, 566 N.E.2d 128, 132 (1990) (footnote

omitted)).

    In the present case, plaintiffs have not alleged that they had commenced construction prior to

the enactment of the local laws.  Apparently, until at least July 6, 2006 – the day that they were

informed of Local Law No. 5 of 2004 – plaintiffs did not believe that they had the authority to begin

construction of the Project.  Plaintiffs were still attempting to secure a formal grant of a permit as of

this past summer and, to date, and have yet to commence any construction at all.  The fact that

plaintiffs allegedly received a permit by operation of law is inconsequential because, absent the

initiation of construction, they have no vested right that allows them to construct and operate the Project notwithstanding the prohibitory change in the zoning law. *See DLC Mgmt. Corp.*, 163 F.3d at 130 (dismissing plaintiffs' due process claims when they spent over $1 million in connection with their application for a land use permit but never built anything on the property). Accordingly, plaintiffs have not shown that they have a protected property interest, and their due process claim must therefore fail. *See id.* at 131 ("Because plaintiffs neither began construction on nor otherwise improved the land, and because plaintiffs do not allege that any delay in construction was caused by an attempt by defendants to prevent vesting, it is clear that plaintiffs' rights had not vested under New York law. In our view, this determination ends the [due process] analysis and establishes plaintiffs' lack of a legitimate claim of entitlement to the Planned Business zoning classification."); *Overhoff*, 143 F. Supp. 2d at 386 ("It is only when such a [property] right is established that the court may turn to a discussion of whether there has been a deprivation of that right without due process.").

## CONCLUSION

For the foregoing reasons, the motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) filed by defendants the Village of Chester and the Planning Board of the Village of Chester is granted. The Clerk's Office is directed to enter judgment in favor of defendants, dismissing the Complaint in its entirety, with prejudice and without costs or attorneys' fees.

SO ORDERED.
Dated: White Plains, New York
     June 27, 2007

                                      *William C. Conner*
                                  Sr. United States District Judge

10